SHERIDAN DRIVE-IN, INC., Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 36384.)

Fourth Department, May 18, 1962.

*Borins & Snitzer (Leo J. Fallon* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General (Donald A. MacHarg* and *Paxton Blair* of counsel), for respondent.

HALPERN, J. The State appropriated a substantial part of the site of claimant's drive-in theatre in the Town of Tonawanda for use in connection with the construction of the Niagara section of the New York State Thruway. The claimant's premises abutted on Grand Island Boulevard on the west and on Ensminger Road on the north. Grand Island Boulevard was a heavily travelled highway. As a result of the appropria-

tion, the claimant's premises were no longer usable as a drive-in theatre.

The claimant's attorney opened negotiations with the representatives of the State Department of Public Works with a view to settling its claim for damages for the appropriation. The initial demand by the claimant was $400,000. Hendricks, the representative of the State, made a counteroffer of $250,000. In subsequent negotiations, he indicated that his offer might be increased to $325,000. This was all on the assumption that, as a result of the appropriation, the claimant would no longer be able to operate a drive-in theatre in the vicinity of its established and highly successful location. However, upon further investigation, Hendricks ascertained that the claimant could readily acquire the adjoining premises to the east of its original site, abutting on Ensminger Road, and he pointed out to the claimant's attorney that the claimant's loss would be substantially reduced if it moved its drive-in theatre to the adjoining premises. He argued that the public would have access to the new site from Grand Island Boulevard, because Ensminger Road, according to the State's plans, was to be carried across the Thruway by a bridge connecting Ensminger Road with Grand Island Boulevard. The parties proceeded to negotiate a settlement on this basis.

During the course of the negotiations, Hendricks died and McCord, the chief of the right-of-way and claims department in the City of Buffalo, took over the negotiations on behalf of the State. It was agreed that the plan proposed by Hendricks was a feasible one and that, by utilizing the proposed Ensminger bridge as a means of bringing traffic from Grand Island Boulevard to the new site of the theatre, the claimant could operate a drive-in theatre successfully on the adjoining site and thereby reduce its loss substantially below the figure of $325,000 which had been mentioned by Hendricks. McCord finally offered $215,000 in settlement of the reduced loss. The State's plans exhibited by McCord to the claimant's attorney showed the bridge across the Thruway, connecting Ensminger Road with Grand Island Boulevard. McCord represented that the plans were "final". The claimant's attorney asked for further assurance on this point and, after an interval of a few days which he indicated he needed for further investigation and inquiry, McCord advised the claimant's attorney that he was then in a position to give him definite assurance that the plans were "final" and that the bridge would be built. Upon that

basis, the claimant's attorney agreed to accept the State's offer of $215,000. A settlement agreement was accordingly drawn and executed by the parties and the $215,000 was paid by the State on December 16, 1955.

Thereafter, the claimant acquired the adjoining premises and built a new drive-in theatre, on Ensminger Road, at a cost of about $315,000. The theatre was completed and opened in July, 1956. Thereafter, contracts were duly let by the State for the relocation of Ensminger Road and for the construction of the bridge carrying the relocated road across the Thruway and work was actually commenced on the construction of the bridge in January, 1957. However, in the meantime, the Federal-Aid Highway Act had been passed on June 29, 1956, and pursuant to that act Federal aid became available for the Power Line Expressway, the construction of which had been contemplated for some time. (See former section 340-a of the Highway Law, added by chapter 357 of the Laws of 1956, and new section 340-a, substituted therefor by chapter 585 of the Laws of 1957.) New plans for an interchange between the Power Line Expressway and the Thruway were ordered to be prepared. In view of the proposed interchange connecting the two expressways, it was found that under Federal regulations, greater sight distances and longer curves would be required and that it would not be permissible, if Federal aid was to be obtained, to carry Ensminger Road across the Thruway by a bridge as had been originally planned. Accordingly, on April 22, 1957, the State cancelled the plans for the Ensminger bridge and directed the contractor to suspend work thereon. Ensminger Road was terminated at the Thruway and the bridge was deleted from the plans. As a result, the claimant's new drive-in theatre was left without direct access to any principal highway. The nearest principal highway was over two miles away, and the claimant's new theatre could be reached from that highway only by a devious route through secondary roads.

The claimant filed a claim for two items of damage it had suffered: (1) the difference between $325,000, the value of its appropriation claim, and the sum of $215,000, which the claimant had accepted therefor upon the erroneous assumption that the Ensminger Road bridge would provide a means of access from Grand Island Boulevard to the new theatre site; (2) the difference between the amount expended by the claimant for its new drive-in theatre and the amount of its present value in view of the elimination of the Ensminger Road bridge.

Upon the trial, it was established that the claimant would have been entitled to $325,000 for the damages caused by the original appropriation and that it would have received that sum, if it had not been for the settlement made upon the erroneous assumption as to the Ensminger bridge. It was also proved that the new theatre built in reliance upon the same erroneous assumption was worth about $100,000 less than it had cost to acquire the new site and to build the theatre.

The Court of Claims Judge found that the facts were substantially as claimed by the claimant but he nevertheless dismissed the claim upon the ground that the representations made by the State's agents were true at the time that they were made and that it was in fact the State's intention at that time to build the bridge but that there had been a subsequent change of plans, for which no relief could be given to the claimant.

The Court of Claims' decision seems to us to have been based upon much too narrow a view of the nature of the representations made by the State's agents. They had represented, not only that it was the then existing intention of the State to build the Ensminger Road bridge, but that the plans therefor were " final ". There was an implied representation that the term " final ", as used in this context, meant that the decision of the State to build the bridge was irrevocable and was not subject to change. At any rate, that was the interpretation reasonably placed upon the term by the claimant's attorney and the State's agents knew that that was his interpretation. That interpretation became the basis upon which subsequent negotiations were conducted. The claimant's attorney insisted upon an assurance that the plans were " final " in the sense in which he construed the term and this assurance was repeatedly given to him.

Both parties must have understood that the word " final ", as used in the course of the negotiations, meant irrevocable; otherwise, it could not have played any effective part in leading the parties to reach a settlement. The claimant could not have been induced to accept a reduced amount in settlement of its appropriation claim, merely by an assurance that the State had a present intention to build the bridge, subject, however, to a right to change its intention. If the State's agents had put the matter to the claimant in this way, it is clear that the claimant would not have accepted the reduced settlement and would not have undertaken the construction of a new theatre. The assurance which was needed and which was given was that there was an irrevocable commitment on the part of the State to build the bridge.

In these circumstances, it plainly follows that when the claimant discovered that the plans were not "final" at all but that the State had reserved the right to change them and, in fact, had changed them, the claimant had the right to rescind the settlement agreement. Upon such rescission, the claimant became entitled to recover, by way of restitution, full compensation for the appropriation by the State, less the amount theretofore paid by the State. The right of a party to an agreement to rescind it because of mutual mistake or because of mistake on his part induced by misrepresentation by the other party is well settled (*Seneca Wire & Mfg. Co.* v. *Leach & Co.*, 247 N. Y. 1; Restatement, Contracts, § 502; 1946 Report of N. Y. Law Rev. Comm.; N. Y. Legis. Doc. No. 65[B], pp. 33–78).

Even if it is assumed that the mistake was a unilateral mistake on the claimant's part and that it was not caused by any misrepresentation by the State's agents, the fact remains that the mistake was known to the State's agents, and the claimant therefore had the right to rescind the settlement agreement upon discovery of the mistake. Rescission may be allowed even for a unilateral mistake, in order to prevent an unjust enrichment of the other party. "A mistake not mutual but only on one side may be ground for rescinding but not for reforming a contract" (*Rosenblum* v. *Manufacturers Trust Co.*, 270 N. Y. 79, 85; *Batto* v. *Westmoreland Realty Co.*, 231 App. Div. 103). It is universally recognized that there is a right of rescission for a unilateral mistake if the mistake was known to the other party at the time of the negotiating of the contract and was not corrected by it (*Bank* v. *Board of Educ. of City of N. Y.*, 305 N. Y. 119; *City of New York* v. *Dowd Lbr. Co.*, 140 App. Div. 358; 5 Williston, Contracts [Rev. ed.], §§ 1557, 1573; Restatement, Contracts, § 471, subd. [c], § 472, subd. [1], par. [b]; New York Law of Contracts, § 83).

Before the adoption of section 112-g of the Civil Practice Act (L. 1946, ch. 683), it would have been necessary for the claimant to tender the return of the moneys received before instituting an action at law for restitution based upon a rescission (*E. T. C. Corp.* v. *Title Guar. & Trust Co.*, 271 N. Y. 124; *Kamerman* v. *Curtis*, 285 N. Y. 221) but that section makes a tender unnecessary. The court is authorized in its final judgment to take account of the moneys theretofore paid and to deduct them from the amount of the recovery (1946 Report of N. Y. Law Rev. Comm., *supra*). The new section allows the court in an action at law "based upon rescission" to apply the rules which are applicable to actions in equity "for rescission"

(see p. 33, Off. Note by Law Rev. Comm. to § 112-g of Civ. Prac. Act, citing *Allerton* v. *Allerton,* 50 N. Y. 670; *Marr* v. *Tumulty,* 256 N. Y. 15).

The Court of Claims Judge seems to have been under the impression that rescission for mistake or misrepresentation was exclusively an equitable remedy and that, since the Court of Claims did not have general equity jurisdiction (*Psaty* v. *Duryea,* 306 N. Y. 413), relief upon the theory of rescission could not be granted in that court. But this overlooks the long-settled right of a party to an agreement into which he had entered as the result of mistake or misrepresentation, to rescind the agreement by his own act, upon discovery of the truth, and to maintain an action at law for restitution based upon the rescission (*Seneca Wire & Mfg. Co.* v. *Leach & Co.,* 247 N. Y. 1, *supra*). "The plaintiff brought this action at law on the rescission to get its money back * * * It seeks relief on the same ground that rescission might be maintained in equity by proving that the representations were false in fact, and misled the plaintiff into making the purchase * * * As no equitable relief was required, it was inappropriate, if not impossible, for the plaintiff to maintain an action for rescission in equity. All it wanted was the return of its money. Action at law was, therefore, proper. The proof required was no different from that which would be required in equity. No reason exists for a distinction" (*Seneca Wire & Mfg. Co.* v. *Leach & Co., supra,* p. 7).

The history of the case of *Benz* v. *New York State Thruway Auth.* is interesting in this connection. The plaintiff in that case sued in the Supreme Court in equity to rescind or to reform an agreement under which it had settled its claim for land appropriated by the State, because of fraudulent representations alleged to have been made by the State. The complaint was dismissed at Special Term upon the ground that an action in equity in the Supreme Court could not be maintained against the State or the Thruway Authority. The dismissal was affirmed by this court (11 A D 2d 906) and by the Court of Appeals (9 N Y 2d 486). The United States Supreme Court granted certiorari (368 U. S. 886) but, after argument, the writ of certiorari was dismissed as improvidently granted (369 U. S. 147). As the Attorney-General stated in his brief in the United States Supreme Court, there was no need to resort to a court of equity in order to rescind the settlement agreement. "There is nothing either in the State statutes or decisions which requires a claimant in an appropriation case to first cause

an 'Agreement of Adjustment' to be judicially cancelled as a condition precedent to the filing in the Court of Claims of a claim based upon the appropriation '' (p. 39, Attorney-General's brief in the *Benz* case). As the Attorney-General further pointed out, '' the petitioner is authorized to sue in the Court of Claims on [her] original claim which arose out of the appropriation of her property '', if she claimed that the settlement agreement had been induced by fraud. '' The respondent, of course, may interpose the Agreement of Adjustment by way of avoidance * * * In such action the petitioner would be in a position, and it would be her burden, to allege and prove the invalidity of the agreement on whatever legal ground she chose ''. It is our understanding that Mrs. Benz will now submit her claim against the State to the Court of Claims for the full value of the land appropriated, on the theory that she had rescinded the settlement agreement because of fraud.

Restitution based upon the theory of rescission will provide the claimant an adequate remedy for the difference between the amount accepted in settlement and the amount of the claimant's original claim for compensation growing out of the State's appropriation but it will not, of course, take care of the claimant's additional claim for loss suffered because of expenditures made for the new theatre.

The claimant will be entitled to recover this additional item of damage upon establishing that the expenditures were made in reliance upon false representations by the State's agents, that the representations were known to be false, and that they were made with the intent to induce the claimant to rely upon them. Recovery of additional damages alleged to have been caused by fraud is not barred by the exercise of the right of rescission (Civ. Prac. Act, § 112-e). But while innocent misrepresentations are sufficient for rescission they cannot be the basis of a recovery of damages for fraud (*Kountze* v. *Kennedy*, 147 N. Y. 124).

There is proof in the record that at least one employee of the State Department of Public Works, although not the one who had carried on the negotiations with the claimant's attorney, was well aware of the fact that so-called final plans for State highways and bridges were not '' final '' in the sense of representing irrevocable decisions, but were '' frequently changed '' even after construction had been started. Of course, the claimant did not know or realize this. No proof was offered as to the state of McCord's knowledge but in view of the fact that McCord had had long experience in dealing with State highway

plans and appropriation claims, the trier of the facts would have the right to infer that McCord, too, fully understood the revocable character of so-called final plans. If that is found to be the fact, McCord was guilty of fraud, for which the State is liable. (*Channel Master Corp.* v. *Aluminum Ltd. Sales,* 4 N Y 2d 403.)

Furthermore, even if it is found that McCord was unaware of the fact that the decision of the State was not irrevocable, his superiors in the department must have been aware of that fact. If it is found that they were informed of the representation made by McCord and did not instruct him to correct it, although they knew it to be false, the State is chargeable with fraud (1 Restatement, Agency 2d, § 256).

Even if the representation made by the State's agents is regarded as an ambiguous one, the State may be chargeable with fraud. If an ambiguous term is used in making a representation in a business transaction, and the other party, to the knowledge of the one making the representation, interprets the term in the sense in which it is false, there is liability for fraud if the erroneous impression created by the ambiguous representation is not corrected (*Downey* v. *Finucane,* 205 N. Y. 251, 264; Restatement, Torts, § 527; Prosser, Torts [2d ed.], p. 532; 1 Harper and James, The Law of Torts, § 7.14, p. 587).

Liability in fraud may also be based upon the ground that the representation by the State's agents that the plans were '' final '' was the statement of a half-truth. '' A statement in a business transaction which, while stating the truth so far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation '' (Restatement, Torts, § 529). If the State's agents knew that so-called '' final '' plans were '' frequently changed '' and did not disclose this to the claimant's attorney when they stated that the plans were '' final '', they were chargeable with having consciously misled the claimant's attorney by stating what they knew to be a half-truth. This constituted fraud (*Ottinger* v. *Bennett,* 203 N. Y. 554, revg. 144 App. Div. 525, 533 on the dissenting opinion below). '' Silence may * * * constitute fraud where one of two parties to a contract has notice that the other ' * * * is acting upon a mistaken belief as to a material fact ' '' (*Bank* v. *Board of Educ. of City of N. Y.,* 305 N. Y. 119, 133–134, *supra*).

The judgment appealed from should be reversed on the law and the facts and a new trial granted, with costs to the claimant to abide the event.

WILLIAMS, P. J., BASTOW, GOLDMAN and McCLUSKY, JJ., concur.

Judgment unanimously reversed on the law and facts and a new trial granted, with costs to the appellant to abide the event.